Filed 1/14/15  P. v. Contreras CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063428 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD236438) |
| LEONEL CONTRERAS et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed in part and reversed in part.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant Leonel Contreras.

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant William S. Rodriguez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Tami F. Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Leonel Contreras of one count of conspiracy to commit kidnapping and/or forcible rape (Pen. Code,[1] § 182, subd. (a)(1); count 1); two counts of kidnapping (§ 207, subd. (a); counts 2 & 14), seven counts of forcible rape (§ 261, subd. (a)(2); counts 3, 5, 7-8, 15, 17 & 20), one count of rape by a foreign object with force (§ 289, subd. (a)(1)(A); count 4), eight counts of forced oral copulation (§ 288a, subd. (c)(2)(A); counts 6, 9, 11-13, 18-19 & 21), and two count of sodomy by use of force (§ 286, subd. (c)(2)(A); counts 10 & 16).[2] Numerous enhancements allegations accompanied the sexual offense counts, including that the crimes were committed during a kidnapping and involved multiple victims. The jury found all of the accompanying enhancements applicable, except for the multiple victim enhancements for counts 4 and 5.

The prosecution charged William Steven Rodriguez with the same offenses and many of the same enhancement allegations. A separate jury convicted Rodriguez of counts 2, 8 through 12, 14 through 16, and 21, and found the accompanying enhancement allegations applicable.[3]

---

[1] Further statutory references are also to the Penal Code unless otherwise stated.

[2] The victims were identified below as Jane Doe 1 (Doe 1) and Jane Doe 2 (Doe 2). (§ 293.5.) Counts 2 through 13 were crimes against Doe 1 and counts 14 through 21 were crimes against Doe 2.

[3] The jury found Rodriguez not guilty of count 4. The jury could not reach unanimous verdicts on counts 1, 3, 5 through 7, 13, and 17 through 20. The court declared a mistrial as to these counts and later dismissed them without prejudice.

The court sentenced Contreras to a prison term of 50 years to life plus eight years. The sentence consisted of consecutive terms of 25 years to life for counts 3 and 15, plus two consecutive four-year terms for the weapon use enhancements accompanying those counts. The court imposed concurrent terms for counts 1, 4 through 13, and 16 through 21. It stayed the sentences for counts 2 and 14 under section 654.

The court sentenced Rodriguez to a prison term of 50 years to life. The sentence consisted of consecutive terms of 25 years to life for counts 8 and 15. The court imposed concurrent terms for counts 9 through 12, 16, and 21. It stayed the sentences for counts 2 and 14 under section 654.

Contreras and Rodriguez both appeal, contending their sentences constitute cruel and unusual punishment because they were juveniles when they committed their crimes and their sentences do not provide them with a meaningful opportunity for parole in their lifetimes. Contreras additionally contends we must reverse his convictions because the court prejudicially erred by (1) admitting evidence of his confession; (2) excluding his expert evidence, third party-culpability evidence, and character evidence; (3) declining to dismiss counts 4, 7, and 10 due to defective verdicts; (4) denying his motion to discover juror personal identifying information; and (5) denying his motion for a new trial based on juror misconduct. He also contends we must reverse his convictions because the accumulation of these errors deprived him of a fair trial.

We conclude Contreras and Rodriguez's sentences constitute cruel and unusual punishment because they do not comply with the requirements set forth in *Graham v.*

*Florida* (2010) 560 U.S. 48 (*Graham*).  We, therefore, reverse the sentences and remand the matter for resentencing.  We affirm the judgments in all other respects.

BACKGROUND

*Prosecution Evidence Presented to Both Juries*

Doe 2, then 15, accompanied Doe 1, then 16, and Doe 1's parents to a party for one of Doe 1's relatives.  The party was at the relative's house.  At dusk, while the party was still going on, the girls went for a walk and sat down by a tree in an open space area.  Contreras, then 16, and Rodriguez, then 16, walked past them.  Both boys wore dark clothing with hoods covering their heads.  Rodriguez wore a red and black cap, a dark-colored Padres T-shirt, and a long-sleeve, plaid or checkered jacket with a gray hood.  Contreras wore a long-sleeve, dark-colored, hooded jacket.

A short time later, Contreras and Rodriguez tackled the girls from behind.  Contreras tackled Doe 1 and Rodriguez tackled Doe 2.  Both boys wore bandanas covering their noses and mouths.  Contreras held a knife to Doe 1's throat.  One of boys asked for the girls' cell phones.

The boys pulled the girls up and started taking them toward a street.  Rodriguez covered Doe 2's mouth with his hand as she struggled to get away.  Contreras repeatedly told Doe 1 to tell Doe 2 to "shut the f——k up."  The boys forced the girls to walk across the street, up an embankment, and into a wooded area.  As they started going up the embankment, Doe 2 continued to struggle and threw her weight backward, causing both her and Rodriguez to stumble.  Doe 2 bit Rodriguez's hand and tried to get away.  However, Doe 1, at Contreras's direction, told Doe 2 to be quiet and stop resisting.

4

When Doe 2 got up off the ground, Rodriguez tied his bandana around her mouth and told her he would hurt her if she screamed. He took her to a clearing. Contreras took Doe 1 to a different location nearby. The area was not lighted and was not visible from the street.

Rodriguez took off Doe 2's shorts and underwear. He told her to get down. As she lay on her back, he got on top of her, put his penis in her vagina, and started thrusting in and out. He pulled down the bandana and kissed her, putting his tongue in her mouth. He told her not to scream or he would hurt Doe 1. He asked her if she liked what he was doing. She was wearing a purity ring and had never had sexual intercourse before. His actions were painful and caused her to wince.

After what seemed like a long time to Doe 2, Rodriguez made her flip over. As she lay on her stomach, he put his penis in her anus and started thrusting in and out.

As Rodriguez was assaulting Doe 2, Contreras had Doe 1 lay down. He took off her shorts, underwear, and shoes, had her help him take off her dress, and had her take off her bra. He touched her breasts and tried to push his penis into her vagina, but his penis was soft. He asked her whether she was a virgin and she told him she was. He put his fingers in her vagina for a couple of seconds, which was painful for her. He told her to keep her legs open and pushed his now erect penis into her, which was also painful for her. He then started thrusting in and out.

After awhile, he took his penis out of her vagina, stood up, told her to suck it, and warned her he did not want to feel any teeth. He put his penis in her mouth and pushed her head back and forth. She gagged and threw up. He then pushed his penis back into

her vagina. He told her to keep quiet and keep her legs open. She tried to keep quiet, but made some noise because she was uncomfortable. He told her to shut up. He kept the knife in his pocket during the sex acts.

Around this time, Rodriguez called over to Contreras and the two boys switched places. Rodriguez kissed Doe 1 and bit her cheek and neck. He put his penis in her vagina and thrust in and out. He then put his penis in her mouth and pushed her head back and forth. She gagged and threw up again. He lay down on the ground, had her get on top of him, pushed his penis into her anus, and had her "hump" him by moving up and down. After a couple of minutes, he had her sit back down. He put his penis in her mouth again and pushed her head back and forth. She gagged and threw up again.

As Rodriguez was engaging in sex acts with Doe 1, Contreras took off Doe 2's dress and had her help him take off her bra. Once all of her clothes were off, he had her lay on her back. While holding the knife to her neck, he told her to open her legs "really wide." He then put his penis into her vagina and started thrusting. The action was painful to her. He asked whether she was a virgin and she told him she was. He also asked whether she had a boyfriend and where she went to school. She told him she did not have a boyfriend and what school she attended.

After some period of time, Contreras moved further up on Doe 2. While holding the knife in his hand, he put his penis in her mouth and told her to suck it. She turned her head away and told him she could not breathe. He put his penis back in her mouth and told her to try. She turned her head away again. He changed their positions so he lay on his back and she was on top of him. He told her to put his penis in her vagina. She told

6

him she did not know how, so he put it in himself.  He told her to jump up and down, but she did not know what he meant.  He thrust up and down while fondling her breasts.  His knife was on the ground nearby.  When they were in this position, Contreras's bandana slipped and Doe 2 got a good look at his face.

At some point, Contreras asked Doe 2, "Did [Rodriguez] f—k your mouth?"  She told him no.  Rodriguez then brought Doe 1 over to the same place as Doe 2.  Once more, Rodriguez put his penis in Doe 1's mouth and pushed her head back and forth.  Once more, she threw up.  Afterwards, the two boys switched again.

Rodriguez had Doe 2 get on her back and he put his penis in her mouth.  She turned her head away and told him she could not breathe, but he put his penis back in her mouth.  While this was occurring, Contreras put his penis in Doe 1's mouth.  He moved her head back and forth and warned her he did not want to feel any teeth.  She gagged yet again.  Neither Contreras nor Rodriguez wore a condom during any of the sex acts.

When the boys decided to stop, they had the girls put their clothes back on.  As Doe 2 was getting dressed, Rodriguez kissed Doe 2, touched her legs, put his finger in her vagina, and told her she was beautiful.  Before Doe 1 got dressed, Rodriguez also kissed her and asked her if she liked what had happened.  He told her she was beautiful and that, if they had known each other before, she would have been his girlfriend.

Meanwhile, Contreras pulled a bicycle from the bushes.  The boys then directed the girls which way to go and told them not to say anything to anyone.  One of the boys said they would follow the girls home and come after the girls if they ever told anyone.  Contreras also threatened to find and hurt one of Doe 1's young relatives.

7

The girls walked down the slope and across the street, where they met up with Doe 1's parents, who had been looking for them. They got in Doe 1's parents' car and left. Doe 1's mother asked where they had been and what had happened to them.

At first, the girls did not say anything. Doe 2 did not say anything because she thought the boys were still close by and she just wanted to get away. However, Doe 1's mother asked them directly if they had been raped and they acknowledged they had been. Doe 1's parents took them back to Doe 1's relative's home, where someone called the police. Shortly after the police were notified of the crime, a helicopter flew over the area repeatedly announcing the suspects' descriptions and that they were riding on the same bicycle.

On the night of the crimes, Rodriguez and Contreras were staying at Rodriguez's aunt's home, which was near the crime scene.[4] Around the time the crimes were occurring, Rodriguez's aunt searched in and around the house for them, but could not find them. Sometime later, she heard a door slam. Five to seven minutes after that she heard the helicopter. When she learned what the helicopter was broadcasting, she hoped the suspects were not Rodriguez and Contreras.

She searched again for the two boys and found them in the garage. She was angry by the coincidence of their arrival and the helicopter's broadcasts. She told a police detective she initially thought the boys might be the suspects. However, she later

---

[4] Although their precise relationship is not clear from the record, Contreras referred to the woman as his aunt and to Rodriguez as his cousin.

concluded the boys could not have committed the crimes because they were too young and no one in the family owns anything with the "Padres" name on it.

When Rodriguez's cousin heard the helicopter's broadcasts, she went into the garage and confronted the boys. They were sweaty and looked nervous. Her mother, Rodriguez's aunt, told her Contreras admitted being one of the assailants, but he blamed Rodriguez for the crimes and said Rodriguez was the one with the knife.

A police detective found a bicycle matching the description of the one the assailants used along the side of Rodriguez's aunt's house. Detectives also found clothing in Rodriguez's aunt's garage and Rodriguez's father's home matching the girls' description of what the boys wore the night of the crimes. About six weeks after the crimes, a landscape worker found a knife while clearing brush near the crime scene.

After reporting the crimes, the girls submitted to sexual assault examinations. The girls' injuries and other physical findings were consistent with the girls' version of events.

DNA testing was conducted on swabs taken from the girls during their examinations. The tests showed Rodriguez was included as a possible minor contributor to a DNA mixture found on a swab taken from Doe 1's breast, Rodriguez was included as a possible major contributor and Doe 2 was included as a possible minor contributor to a DNA mixture found on a swab taken from Doe 1's neck, and Rodriguez was included as a possible contributor to a DNA mixture found on a swab taken from Doe 1's vulva.

DNA testing was also conducted on several items of clothing found by detectives, including a black hooded sweatshirt, a Padres T-shirt, and a plaid jacket. Rodriguez, Doe 1, and Doe 2 were all included as possible major contributors to a DNA mixture found on

9

swabs taken from the waistband and shoulder area of the sweatshirt. They were also all included as possible contributors to a DNA mixture found on a swab taken from the cuffs, and Rodriguez and Doe 1 were included as possible major contributors to a DNA mixture found on a swab taken from the inside neck.

Doe 1's DNA matched DNA found on a swab taken from the waistband area of the Padres T-shirt. Rodriguez and Doe 2 were included as major contributors and Contreras and Doe 1 were included minor contributors to a DNA mixture found on dark-stained cuttings from the front waistband area of the shirt.

Doe 2 was included as a possible major contributor to a DNA mixture found on a swab taken from the waistband of the plaid jacket, Doe 1 was included as a possible major contributor to a DNA mixture found on a swab taken from the shoulder area, and Doe 1 and 2 were both included as possible major contributors to DNA mixtures found on swabs taken from the inside cuffs and neck area. Doe 2 was included as a possible major contributor to DNA found on presumptively bloodstained cuttings from around the jacket's buttonholes.

Both Doe 1 and Doe 2 identified Rodriguez from a photographic lineup and at trial. Doe 2 also identified Contreras at trial.

*Additional Prosecution Evidence Presented to Rodriguez's Jury*

Rodriguez's jury heard a recording of Rodriguez's statement to police detectives. The statement largely corroborated the victims' accounts.

10

*Additional Prosecution Evidence Presented to Contreras's Jury*

Contreras's jury heard recordings of Contreras's statement to police detectives. Contreras told police detectives he went to his aunt's house the night of the crimes. He had a knife with him. He and Rodriguez discussed what they were going to do that night. Their first idea was to rob people. However, they changed their mind after a lady passed by them. They stashed their bicycle and, as they were walking around, Contreras pointed out Doe 1 and Doe 2 and Rodriguez said, "Let's go."

Contreras said he asked for the girls' cell phone so they would not call anybody. He grabbed the taller girl and told her to stay still. Because he had a knife, he hoped the shorter girl would stay still as well. They took the girls across the street and up the embankment where they had stashed the bicycle. The taller girl tripped on the way up.

When they got to the area where he had stashed the bicycle, he told the taller girl to take off her clothes and bra. Then, he had her turn to face him and he "just put it in the front."

*Contreras's Defense Evidence*

A false confessions expert testified about police interrogation techniques and how false confessions occur. A DNA expert testified it would be extremely improbable for there to be no DNA found following a sexual assault involving multiple instances of anal, oral, and vaginal sex where the assailants did not use condoms. He also testified Contreras's DNA could have been transferred onto the Padres T-shirt from a prior wearing, from the laundry, or from the comingling of Contreras's clothes with

11

Rodriguez's clothes. A crime scene investigation expert agreed Contreras's DNA could have been inadvertently transferred onto the Padres T-shirt.

A friend of Contreras's testified he was with her when the rapes occurred. She also testified he was wearing a plain T-shirt and shorts. He was not wearing a Padres T-shirt. The friend previously told a defense investigator she had been with Contreras on a different day. On cross-examination, she admitted she really did know the exact date she was with Contreras.

## DISCUSSION

### I

### *Contreras's Confession*

#### A

#### 1

Following his arrest, Contreras was taken to police headquarters and placed in an interview room. An officer came into the interview room and took down some basic biographical information. After Contreras had been waiting in the room about an hour, two police detectives came into the room to interview him. The detectives provided him with the admonitions required by *Miranda v. Arizona* (1966) 384 U.S. 436, 478 (*Miranda*), and Contreras agreed to speak with them.

Contreras thought he was there because a classmate had accused him of taking her wallet. The detectives told him they were not concerned about the wallet. Then, he thought he was there because a homosexual kid at school complained about him. The detectives explained they were investigating a crime involving two girls. He denied any

12

knowledge of the crimes.  However, he declined to tell the detectives whom he was with the night the crimes occurred.

After Contreras claimed he could not remember the *Miranda* admonitions, the detectives gave them to him again and he again agreed to speak with the detectives.  They told him they were looking into a sexual assault crime and intimated they had witness statements and evidence, including DNA evidence, inculpating him.  He continued to deny any knowledge of the crimes.  He also continued to decline to state whom he was with when the crimes occurred, indicating he was not supposed to be with that person because of a restraining order.

When the detectives assured him they were not concerned about the restraining order, he told them he was at his aunt's house with his 16-year old cousin.  He said they left the house in the afternoon to get some food, then returned to the house and stayed in the garage listening to music and playing video games for the remainder of the evening. He subsequently admitted they left the garage long enough for his cousin to smoke some marijuana.

At that point, about 30 minutes into the interview, a region-wide power outage occurred, causing the lights to go out in the interview room and the video camera to stop running.  The detectives moved Contreras to a lobby area, next to a large window. Contreras sat in the lobby area for about 15 minutes.  The detectives then moved him to large round table in a well-lighted office area.  The interview continued for approximately two more hours.  Although both detectives thought they were recording the second part of the interview, only one of them was.

13

When the interview resumed, the detectives told Contreras they had spoken with his aunt and she told them she knew he had raped the girls. Contreras disbelieved them. They then told him his aunt had made the statement to some family members, they had DNA evidence against him, and Rodriguez had already confessed. He continued to disbelieve them.

They insisted they had DNA evidence and other forensic evidence, including his semen, linking him to the crimes. They implored him to tell them what happened and to let them and his family know he was remorseful. They also told him some of what Rodriguez had told them. He continued to deny either he or Rodriguez had anything to do with the crimes and demanded to hear the recording of Rodriguez's confession.

Although they told him more of what his aunt had said and more of what Rodriguez had said, he adamantly denied the information was true. He intimated he was being framed. The detectives offered to show him a video recording of Rodriguez talking with them. They emphasized how remorseful Rodriguez was for the crimes.

The detectives showed him a picture of Rodriguez, but he demanded to hear the video recording, suggesting the picture could have been of a doppelgänger. He refused to believe Rodriguez could or would inculpate him. In addition, he said he had no reason to rape anyone because he "had a lot of chicks."

The detectives reiterated Rodriguez had confessed and expressed remorse. They prodded him to do the same, but he continued to disbelieve them. He said he was not listening to them and he knew they were going to arrest him regardless of what he told them because they thought he committed the crimes.

14

Switching tactics, the detectives began using empathy to encourage him to confess. He resisted, remaining firm in his desire to see and hear the video recording of Rodriguez's confession before he told them anything. They played a snippet of the recording for him. He started confessing immediately afterwards.

He declined, however, to provide any specific details about the rapes until he heard more of what Rodriguez had said. After much wrangling over the propriety of showing him more of the recording, the detectives paraphrased bits of Rodriguez's statement. When Contreras expressed doubt they could keep him in custody if he did not tell them himself what happened, the detectives told him they were not going to force him to talk and the DNA evidence would tell them everything they needed to know. He disputed the detectives' claim of having DNA evidence because he and Rodriguez "didn't finish." He then suggested the detectives had gotten the wrong guys and continued to decline to provide further details about the crimes until he heard the recording of Rodriguez's confession.

The detectives switched tactics once again and emphasized the impact of the crimes on the two victims and their need for closure. He then demanded to know how much prison time he was facing. They indicated it was not their decision, but noted the crimes were serious and he was "probably not looking at days."

He said he was afraid he was going to be killed in jail by the other inmates because of his crimes. The detectives acknowledged the other inmates were not going to treat him well, but they did not think the inmates would kill him. They also told him they would be taking him to a juvenile detention facility, not an adult detention facility.

15

The detectives returned to discussing the impact of the crimes on the victims. They told Contreras one of the victims was wearing a purity ring and what it meant to her. During this part of the interview, the detective who had been audio recording the interview left the room to attend to something. About two minutes after she left, the other detective noticed for the first time his audio recorder was off and he turned it on. When the recording resumed, the detective was still discussing the purity ring and the impact of the crimes on the victims. A short time later, Contreras again unequivocally admitted his involvement in the crimes, but this time he provided corroborating details.

2

Contreras filed a pretrial motion to exclude evidence of his confession on the ground it was the involuntary product of psychological coercion. The court denied the motion, finding based on the totality of the circumstances the confession was not coerced. On appeal, Contreras reiterates his contention his confession was involuntary and the court erred by allowing its admission in the prosecution's case-in-chief.

B

" 'An involuntary confession is inadmissible under the due process clauses of both the Fourteenth Amendment to the federal Constitution [citation] as well as article I, sections 7 and 15 of the California Constitution [citation].' [Citation.] 'Under both state and federal law, courts apply a "totality of circumstances" test to determine the voluntariness of a confession.' [Citation.] '[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.' [Citation.] '[T]he question in each

16

case is whether the defendant's will was overborne at the time he confessed. [Citations.] If so, the confession cannot be deemed "the product of a rational intellect and a free will." ' [Citation.] The burden is on the prosecution to show by a preponderance of the evidence that the statement was voluntary. [Citation.] 'When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial court's determination of voluntariness.' " (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1400-1401.)

"In evaluating the voluntariness of a statement, no single factor is dispositive. [Citation.] The question is whether the statement is the product of an ' "essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion. [Citation.] Relevant considerations are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*People v. Williams* (2010) 49 Cal.4th 405, 436.)

" 'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." ' " (*People v. Williams*, *supra*, 49 Cal.4th at p. 436.) "It is well settled that law enforcement may confront a witness with what they know. [Citation.] They may also discuss any advantages that ' "naturally accrue" ' from making a truthful statement. [Citations.] They may explain the possible consequences of the failure to cooperate as long as their

17

explanation does not amount to a threat contingent upon the witness changing her story. [Citations.]  They may even engage in deception as long as it is not of a type 'reasonably likely to produce an untrue statement.' "  (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 79.)  These are precisely the tactics employed by the police detectives in this case.

The length of the interview was not remarkably long, consisting of approximately one hour waiting in an interview room and two and a half hours of questioning.  Because of the region-wide power outage, most of the interview occurred around a table in a well-lighted office area, rather than in a sterile, windowless interview room.  Although there is some indication in the record Contreras was distressed by the initial darkness resulting from the power outage, the police detectives did nothing to capitalize on this distress. Instead, they quickly took him from the interview room to the lobby area and placed him next to a large window.  When the interview resumed 15 minutes later, there was no indication Contreras's responses were in any way affected by the experience.

While Contreras was only 16 years old at the time of the interview and was having some schooling difficulties, his presentation during the interview was intelligent and self-assured.  He showed no susceptibility to any of the interview techniques he complains about on appeal.  He did not believe the police detectives had any DNA or other forensic evidence linking him to the crimes because he "didn't finish," he did not believe his aunt spoke against him, and he was not particularly moved by attempts to empathize with him or get him to empathize with the victims.  Rather, he resisted all efforts to persuade him to talk about the crimes until the detectives finally, truthfully convinced him Rodriguez had already told them what happened.  Accordingly, we cannot conclude under the

18

totality of the circumstances Contreras's confession was the unreliable, involuntary product of impermissible police tactics.

## II

### *Defense Medical Expert*

### A

After the prosecution's medical experts testified, Contreras sought permission to introduce testimony from his own medical expert to establish the girls' injuries may have been consistent with consensual, first time sex rather than forcible rape. The court excluded the testimony under Evidence Code section 352. The court found the evidence would be tangential, speculative, confusing and unduly time consuming because Contreras was raising an alibi defense, not a consent defense and there was no other evidence the girls had consented to the sexual activity.

### B

Contreras contends the court erred in excluding the evidence because the court's decision deprived him of his right to impeach the prosecution's experts and cast doubt on whether the charged crime involved the use of force. On appeal, we will not disturb a court's exercise of discretion to admit or exclude evidence under Evidence Code section 352 unless the court manifestly abused its discretion and the abuse resulted in a miscarriage of justice. (*People v. Thomas* (2011) 51 Cal.4th 449, 485.)

Evidence is relevant if it has "some 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*People v. Contreras* (2013) 58 Cal.4th 123, 152.) Relevant evidence includes

evidence related to a witness's credibility.  (*Ibid.*)  Conversely, evidence is collateral "if it has no logical bearing on any material, disputed issue."  (*Ibid.*)  Evidence bearing on a witness's credibility may still be collateral to a case.  (*Ibid.*)

"[T]he trial court has wide latitude under state law to exclude evidence offered for impeachment that is collateral and has no relevance to the action.  [Citations.]  This exercise of discretion necessarily encompasses a determination that the probative value of such evidence is 'substantially outweighed' by its prejudicial, 'confusing,' or time-consuming nature.  [Citations.]  [¶]  Also, as long as the excluded evidence would not have produced a ' " 'significantly different impression' " ' of the witness's credibility, the confrontation clause and related constitutional guarantees do not limit the trial court's discretion in this regard."  (*People v. Contreras*, *supra*, 58 Cal.4th at p. 152.)

In this case, evidence the victim's injuries were consistent with consensual sex was irrelevant and collateral because Contreras was not presenting a consent defense.  The evidence was also cumulative because two of the prosecution's medical experts specifically acknowledged the victims' injuries could have been caused by consensual sex.

Nonetheless, Contreras suggests the evidence was still admissible to counter the forcible element of the sexual assault-related crimes.  However, in the context of this case, "force" and "consent" are inseparable concepts as "force" refers to the degree of physical force sufficient to support a finding the sexual activity was against the victim's will.  (*People v. Griffin* (2004) 33 Cal.4th 1015, 1023-1025; *People v. Hale* (2012) 204 Cal.App.4th 961, 978.)  Moreover, it does not appear Contreras's expert would have

20

offered much helpful testimony on this point. Based on Contreras's offer of proof, the expert would have testified the victims' injuries were less severe and, by implication, less forceful than the prosecution's experts opined. However, there is no indication the expert would have testified the victims were uninjured, and consequently, no force was used against them at all. We, therefore, conclude Contreras has not established the court abused its discretion in excluding the evidence under Evidence Code section 352.

III

*Third-Party Culpability Evidence*

A

Contreras filed a pretrial motion for permission to introduce evidence Doe 2's father's semen was found in her underpants. Contreras sought to introduce the evidence to show Doe 1 and Doe 2 fabricated their rape claims to hide the fact Doe 2 had had sexual intercourse with her father. The court denied the motion, explaining, "Well, based on everything I know about this case of what [Rodriguez] said happened and what your client said happened, I'm just—I'm not accepting that. That's a weird fact, that there is semen in there, but I don't think that based on the—on what I've read in the preliminary hearing transcript and based on how this case was reported immediately after this—this incident was reported immediately after it happened, that the—both girls had dirt on them or were in—appeared to have been in the type of area that they had been in, in a canyon area, gotten dirty, and which is consistent with their story, and I mean we have evidence that [Rodriguez's] DNA was found on—was it both victims or just one victim?

21

"[PROSECUTOR]: It was found on [Doe 1], but it was the DNA from both victims found on [Doe 1].

"[THE COURT]: Okay. So there's DNA evidence that corroborates that this was a rape. This is not some sort of fabrication to have [Doe 2's father] have sex with his daughter. Like I said, there are other explanations for why his semen might be in her underwear.

"But if—look, let's assume that even if he were having sex with her, which is illegal, that's a different case. That's not before me now. I'm talking about the case that involves your client. And so that evidence—the fact that she may or may not have had sex with her dad on some prior occasion is not relevant to this case. Which I don't think that happened, certainly, and I'm not saying that that happened, but I'm taking it to its extreme, I'm extrapolating out, and if we had a situation where somebody else's semen was found in her underwear and—let me back up.

"If we had evidence that she had had sex with other men before this, this wouldn't be relevant. And I don't think this is relevant in this case. So I'm not going to allow you to call [Doe 2's] father to explain why his semen was in her underwear. And I'm not going to allow you to mention that his semen was found in her underwear.

"I mean you're certainly free to say there was no—my client's semen was not found in her—my client's DNA was not found or my client's DNA was not found in her underwear. That's fair. But I'm not going to—on relevance grounds and also on

22

[Evidence Code section] 352 grounds, I'm not going to allow mention of [Doe 2's father's] semen being in [Doe 2's] underwear."

B

Contreras contends the court prejudicially erred in excluding the third-party culpability evidence. Third-party culpability evidence is admissible if the evidence is capable of raising a reasonable doubt as to defendant's guilt. (*People v. Page* (2008) 44 Cal.4th 1, 38; *People v. Hall* (1986) 41 Cal.3d 826, 833.) The evidence " ' "must link the third person either directly or circumstantially to the actual perpetration of the crime. In assessing an offer of proof relating to such evidence, the court must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352." ' " (*People v. Edwards* (2013) 57 Cal.4th 658, 729.) We review the court's ruling on the admissibility of third-party culpability evidence for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1242.)

As the court pointed out below, the semen evidence, while possibly evidence of another crime, did not directly or circumstantially link Doe 2's father to the crimes at issue in this case. The timing of the girls' report, the nature and recency of their injuries, and the presence of dirt and debris on their bodies established the crimes occurred in an open space area near a home where Doe 1's family had gathered for a celebration. There is no evidence Doe 2's father attended the gathering or was in the area at the time of the crimes. In addition, a confession and DNA evidence established Rodriguez's involvement in the crimes and there is no evidence Doe 2's father knew Rodriguez, much

23

less arranged to participate in a group sexual encounter with him. We, therefore, conclude the third-party culpability evidence was not capable of raising a reasonable doubt as to Contreras's guilt and the court properly excluded it. Because the court did not abuse its discretion in excluding the evidence, the court's decision did not deprive Contreras of due process of law. (*People v. Prince*, *supra*, 40 Cal.4th at p. 1243 [absent an abuse of discretion, exclusion of third party culpability evidence does not impermissibly infringe on a defendant's federal constitutional rights].)

IV

*Character Evidence*

A

As part of his defense, Contreras intended to introduce testimony from three female classmates and two teachers showing he had always behaved respectfully toward his female classmates and had never acted out sexually or demonstrated any sexual deviance with them. He also intended to introduce expert witness testimony showing he lacked the common psychological traits associated with men who rape women.

The court excluded the evidence, finding the evidence was either irrelevant or had only slight probative value and its presentation would be unduly time consuming. Contreras subsequently filed a motion for reconsideration, which the court also denied. Contreras contends the court's exclusion of the evidence deprived him of due process, a fair trial, and a right to present a defense as the evidence would have raised a reasonable doubt as to his guilt.

B

Character evidence is generally inadmissible to prove conduct. (Evid. Code, § 1101, subd. (a); *People v. McAlpin* (1991) 53 Cal.3d 1289, 1305 (*McAlpin*); *People v. McFarland* (2000) 78 Cal.App.4th 489, 493.) However, in a criminal action, character evidence is admissible if the defendant offers it to prove the defendant's conduct. (Evid. Code, § 1102, subd. (a); *McAlpin*, *supra*, at p. 1305; *People v. McFarland*, *supra*, at p. 494.) "This exception allows a criminal defendant to introduce evidence, either by opinion or reputation, of his character or a trait of his character that is 'relevant to the charge made against him.' [Citation.] Such evidence is relevant if it is inconsistent with the offense charged—e.g., honesty, when the charge is theft—and hence may support an inference that the defendant is unlikely to have committed the offense. In appropriate cases, such circumstantial evidence 'may be enough to raise a reasonable doubt in the mind of the trier of fact concerning the defendant's guilt.' " (*McAlpin*, at p. 1305.) Lay and opinion evidence of a defendant's lack of sexual deviance falls within this exception. (*Id*., at pp. 1305, 1309; *People v. Stoll* (1989) 49 Cal.3d 1136, 1152-1153.)

Nonetheless, a court has the discretion to exclude defense character evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352; *People v. Stoll*, *supra*, 49 Cal.3d at p. 1140; *McAlpin*, *supra,* 53 Cal.3d at p. 1310, fn. 15.) We will not disturb a court's exercise of its discretion to exclude evidence under Evidence Code section 352 " '*except* on a showing that the court exercised its discretion in an

25

arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 828.)

In this case, the testimony of the lay witnesses would have had little to no probative value because the setting in which the witnesses knew and interacted with Contreras bore no resemblance to the setting in which the rapes occurred. While the testimony might have established Contreras would never act inappropriately toward a female classmate, especially while in a classroom monitored by a teacher, the testimony had virtually no tendency to establish he would never have committed the rapes at issue in this case. Accordingly, we cannot conclude the court's decision to exclude this evidence, no matter how brief its presentation might have been, was arbitrary, capricious or patently absurd.

Although a closer question, we also cannot conclude exclusion of the expert witness testimony was arbitrary, capricious or patently absurd. The experts' testimony would have consumed a day or more of trial as counsel would have examined and cross-examined the experts on their qualifications, their methodologies and their opinions, the latter of which were reflected in reports totaling 25 pages.

Conversely, the experts' testimony, while not irrelevant, was not especially probative of Contreras' guilt or innocence. Both experts opined Contreras did not meet the criteria for a paraphilia diagnosis. However, their opinions were largely based on Contreras's self-reported information about his sexual history and interests, and both experts acknowledged potential limits on the reliability and validity of the information.

26

Even assuming the information was reliable and valid, neither expert equated the presence or absence of a paraphilia, or any other particular characteristic, with a juvenile's likelihood or unlikelihood of committing a rape. In fact, according to one of the experts, "Research has demonstrated that, as a whole, juvenile sex offenders are a heterogeneous group with numerous differences in their backgrounds and functioning." Nonetheless, the expert noted the characteristics correlated with juveniles who commit sex offenses "include commencement of sexual offending by age 13 or 14, high instances of social isolation and inadequate social skills, poor peer relationships, history of physical/sexual abuse, academic and learning difficulties, behavioral and emotional problems, psychiatric disorders, and family dysfunction." While Contreras possesses many of these characteristics, the expert was careful to point out "correlation does not indicate causation, and it cannot be inferred that the presence of any of these characteristics causes one to sexually offend."

Thus, had the experts testified, their testimony would have consumed one or more days of an already lengthy trial and the jury would have learned nothing more than Contreras does not meet the criteria for a paraphilia diagnosis, but he possesses some characteristics correlated with juvenile sex offenders and neither fact necessarily makes it more or less likely he committed the rapes at issue in this case. Under these circumstances, we discern no abuse of discretion, or constitutional violation, in the court's decision to exclude the evidence. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 82 ["a state court's application of ordinary rules of evidence—including the rule stated in

Evidence Code section 352—generally does not infringe upon" the constitutional right to offer a defense]; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 665-666.)

V

*Verdicts*

A

After the court clerk read the Contreras jury's verdicts, the court inquired of the jury collectively, "[W]ere these and are these your verdicts?"  In unison, they answered, "Yes."  Defense counsel declined to have the jurors polled individually.

The parties later discovered the verdict form for count 4 was not signed; the first page of the verdict form for count 7 was signed, but the second page was not signed; and the verdict form for count 10 was signed, but it was stapled to the verdict form for a lesser included offense, which was not signed.  Contreras moved for dismissal of these counts.  The court denied the motion, finding the defects were minor and did not affect the validity of the verdicts, as it was clear from the verdict forms as a whole the jury intended to convict Contreras of these counts.

B

Contreras contends the defects in the verdicts for counts 4, 7 and 10 require us to reverse his convictions for these counts.  We disagree.

A court may disregard a technical defect in a verdict form if the jury's intent to convict of the specified offense is unmistakably clear and the defect did not prejudice the defendant's substantial rights.  (*People v. Jones* (2003) 29 Cal.4th 1229, 1259; *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272.)  A verdict is insufficient only if it is

28

susceptible to a construction other than guilty of the crime charged. (*People v. Jones* (1997) 58 Cal.App.4th 693, 711.)

In this case, the record shows the verdict form for count 10 was both completed and signed. The fact the verdict form for count 10 was mistakenly affixed to a blank verdict form for a lesser included offense does not by itself cast doubt on the jury's intent to convict Contreras for count 10. The lack of signatures on the verdict form for count 4 and on the second page of the verdict form for count 7 also does not cast doubt on the jury's intent to convict Contreras for these counts as the verdict forms were otherwise completed in favor of a conviction.

Moreover, the law does not require a jury's verdict to be in writing, much less signed. (*People v. Lankford* (1976) 55 Cal.App.3d 203, 211, disapproved on another point in *People v. Collins* (1976) 17 Cal.3d 687, 694, fn. 4; *People v. Mestas* (1967) 253 Cal.App.2d 780, 786-787.) It is the oral declaration of the jurors, not the submission of written verdicts, which constitutes the return of the verdict. (*People v. Traugott* (2010) 184 Cal.App.4th 492, 500; *People v. Green* (1995) 31 Cal.App.4th 1001, 1009.) As Contreras's jury orally and unanimously declared guilty verdicts on counts 4, 7, and 10, we conclude the verdicts for these counts were sufficient and Contreras's substantial rights were not prejudiced by any technical defects in the verdict forms.

## VI

*Juror Information*

### A

After the jury's verdict and before filing a new trial motion, Contreras filed an application for an order releasing jurors' personal identifying information. The application was based on the declaration of the jury foreperson. In the declaration, the foreperson stated she wanted to vote to acquit Contreras, but felt pressured to speed through deliberations and vote to convict him. She also stated she was concerned about the deliberation process as most of the jurors seemed to have decided at the outset Contreras was guilty.

Although she insisted the jury read and discuss each charge, she claimed most of the jurors wanted to bypass the discussion and vote immediately after each charge was read. She and some other jurors wanted some testimony read back and wanted to review some other evidence in depth. Other jurors believed these steps were unnecessary. According to her, she had to fight to get the jury to review the evidence and deliberate. She was also annoyed two jurors had checked their cell phones during deliberations.

She stated she ultimately voted to convict Contreras because she was tired of fighting with the other jurors and she did not want the matter to have to be retried. She felt most of the jurors did not understand their role, the atmosphere in the jury room discouraged questions, and she never wanted to be on a jury again. Finally, she expressed concern Contreras did not receive a fair trial before a jury of his peers because none of the jurors were Hispanic and all of them were at least 15 years older than him.

After going through each paragraph of the declaration, the court denied the motion, finding Contreras had not shown good cause for disclosure of the information. Contreras contends we must reverse the judgment because the court erred in denying the motion.

B

"Under Code of Civil Procedure section 237, in a criminal case, the trial jurors' 'personal juror identifying information'—defined as their names, addresses, and telephone numbers—must be sealed after their verdict is recorded.  (Code Civ. Proc., § 237, subd. (a)(2).)  However, '[a]ny person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information.'  (Code Civ. Proc., § 237, subd. (b); see Code Civ. Proc., § 206, subd. (g).)

"If the trial court finds that the moving party has made a prima facie showing of good cause, and if it finds no compelling interest against disclosure, it must set the matter for hearing.  (Code Civ. Proc., § 237, subd. (b).)  The trial jurors are entitled to notice, an opportunity to object to disclosure, and an opportunity to appear.  (Code Civ. Proc., § 237, subd. (c).)  [¶]  If none of the jurors object, the trial court must grant disclosure. However, if a juror is unwilling to be contacted, the trial court must deny disclosure. (Code Civ. Proc., § 237, subd. (d).)"  (*People v. Johnson* (2013) 222 Cal.App.4th 486, 492.)  We review the court's order granting or denying disclosure for abuse of discretion. (*Ibid.*)

31

To establish good cause for the release of a juror's personal identifying information, the moving party must show: (1) there is a reasonable belief jury misconduct occurred; (2) diligent efforts were made to contact the jurors through other means; and (3) further investigation is necessary to provide the court with adequate information to rule on a new trial motion. (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.) Contreras has not met the first prong of this test.

As explained in more detail in part VII.B below, the jury foreperson's declaration consisted largely of inadmissible hearsay and statements concerning the jury's subjective mental processes. To the extent the declaration contained admissible evidence, the declaration was not sufficient to support a reasonable belief the jury committed misconduct by refusing to deliberate. This is particularly true given the foreperson's own acknowledgment she insisted deliberations occur, the fact it took the jury approximately three and a half days to reach their verdicts, and the existence of jury notes unequivocally showing the jurors reviewed evidence and instructions. Consequently, we conclude Contreras has not established the court abused its discretion in denying disclosure of the jurors' personal identifying information to him.

VII

*New Trial Motion*

A

After the Contreras jury had deliberated a little over a day, the jury foreperson told the bailiff she wanted to talk with the judge and sent the court a note, stating, "My feeling is that the jury has made up [its] mind without having a [thorough] discussion. I have

32

doubt on Ex. 107."  The court responded to the jury by directing it to refer to jury

instruction No. 3550.[5]  Two and a half days later, the jury returned its verdicts.

---

[5]      As given by the court in this case, the instruction informed the jury:  "When you go to the jury room, the first thing you should do is choose a foreperson.  The foreperson should see to it that your discussions are carried on in an organized way and that everyone has an opportunity to be heard.

"It is your duty to talk with one another and to deliberate in the jury room.  You should try to agree on a verdict if you can.  Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors.

"Do not hesitate to change your mind if you become convinced that you're wrong.  . . . But do not change your mind just because other jurors disagree with you.  Keep an open mind and openly exchange your thoughts and ideas about this case.  Stating your opinion too strongly at the beginning or immediately announcing how you plan to vote may interfere with an open discussion.

"Please treat one another courteously.  Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other.

"As I told you at the beginning of the trial, do not talk about this case or about any of the people or any subject involved in it with anyone, including but not limited to your spouse or other family members or friends, spiritual leaders or advisors or therapists.

"You must discuss the case only in the jury room and only when all jurors are present.  Do not discuss the deliberations with anyone.  Do not communicate using the internet, cell phone or any other social media or any other device during your deliberations.

"During the trial, several items were received into evidence as exhibits.  You may examine what exhibits you think will help you in your deliberations.  These exhibits will be sent to you in the jury room when you begin to deliberate.

"If you need to communicate with me while you're deliberating, send a note through the bailiff signed by the foreperson or by one or more members of the jury.  [¶] To have a complete record of the trial, it is important that you not communicate with me except in [a] written note.  [¶]  If you have questions, I will talk with the attorneys before I answer them.  So it may take some time.  You should continue your deliberations while you wait for an answer.  I will answer any questions in writing or orally here in open court.  [¶]  Do not reveal to me or anyone else how the vote stands on the question of guilt or issues in the case, unless I ask you to do so.

"Your verdict on each count and any special findings must be unanimous.  This means that to return a verdict, all of you must agree to it.  [¶]  Do not reach a decision by a flip of the coin [or] any other similar act.  [¶] . . . [¶]  "It is not my role to tell you what your verdict should be.  Do not take anything that I said or did during the trial as an indication of what I think about the facts, the witnesses or what your verdict should be.

33

Contreras subsequently filed a motion for new trial based upon juror misconduct. The motion was supported by the same declaration from the jury foreperson described in part VI.A, *ante*. The court denied the motion, finding it could not consider many of the foreperson's statements because they were either based on hearsay or delved into the jury's thought processes. The court further found the statements it could consider did not demonstrate juror misconduct. Contreras contends the court erred in denying his motion.

B

A court may grant a new trial when the jury has "been guilty of any misconduct by which a fair and due consideration of the case has been prevented." (§ 1181, item 3; *People v. Collins* (2010) 49 Cal.4th 175, 242.) " ' "When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible. [Citation.] If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial." ' " (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1042.) " 'Because a ruling on a motion for a new trial rests so completely within the trial court's discretion, we will not disturb it on appeal absent " ' "a manifest and unmistakable abuse of discretion." ' " ' " (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1247-1248.)

---

"You must reach your verdict without any consideration of punishment.

"You will be given verdict forms. As soon as all jurors have agreed on a verdict, the foreperson must date and sign the appropriate verdict forms and notify the bailiff. [¶] If you are able to reach a unanimous decision on only one or some—or only some of the charges, fill in those verdict forms only and notify the bailiff. Return any unsigned verdict forms."

34

Here, as previously noted, many of the statements in the jury foreperson's declaration were inadmissible hearsay. "Hearsay evidence offered in support of a new trial motion that is based on alleged jury misconduct ordinarily is insufficient to establish an abuse of discretion in either denying the motion or declining to conduct an evidentiary hearing." (*People v. Manibusan* (2013) 58 Cal.4th 40, 55.) Some of the statements were also inadmissible because they concerned the jury foreperson's and other jurors' subjective mental processes. "[A] court may not consider evidence of a juror's subjective process in deciding whether to grant a new trial based on purported juror misconduct." (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1250, fn. 27, citing Evid. Code, § 1150; *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 75.)

To the extent the declaration contained admissible evidence, the declaration failed to show the jurors refused to deliberate. " 'A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1410-1411.) Although the jury foreperson's declaration stated some jurors appeared to be persuaded of Contreras's guilt from the outset of deliberations, the declaration did not contain any objectively verifiable facts indicating any juror refused to participate in deliberations. To the contrary, the declaration stated the jury, at the jury foreperson's insistence, reviewed

35

each of the charges and the related evidence before reaching their verdicts.  The review took multiple days and involved at least two read backs of testimony, indicating it was not perfunctory.  Accordingly, we conclude the court did not abuse its discretion in finding Contreras had not made a sufficient showing of juror misconduct to warrant a new trial.  (*People v. Thompson* (2010) 49 Cal.4th 79, 141.)

## VIII

### *Cumulative Error*

Contreras contends the accumulation of the above errors deprived him of due process of law and, consequently, requires us to reverse his conviction.  We reject this argument as "[w]e have found no error that, either alone or in conjunction with others, prejudiced [him]."  (*People v. Williams* (2013) 56 Cal.4th 165, 201.)

## IX

### *Sentences*

### A

At the time the court sentenced Contreras and Rodriguez, the court recognized their status as juvenile nonhomicide offenders required it to consider their age and other mitigating circumstances in sentencing them.  After considering the mitigating circumstances along with the circumstances of the crimes and the impact of the crimes on the victims, the court sentenced Rodriguez to 50 years to life.  The court explained, "I read and considered all of the information that has been provided to me about your background, your history, and I agree that's tragic, but I have to weigh that against the horrible scars that you have left on these two girls.  . . .  I  can't say I am going to

sentence you 25 to life on one victim and then make it all concurrent because [to] my thinking, you don't get a free victim."

When the court sentenced Contreras to 50 years to life plus eight years, the court likewise declined to give him "a free victim."  It also viewed Contreras's prospects for rehabilitation more gravely, noting, "If you look at all of [Contreras's] psychology and you look at kind of where he came from, he likes to be the guy that calls the shots.  He likes to be the guy in charge.  He was definitely the guy in charge in this particular event. It was brutal and callous and ruthless.  I think that he, for whatever reason, has some brutality and callousness and ruthlessness.

"[Rodriguez] had no prior record either yet he admitted he was involved in this whole event.  . . .  [Contreras] is not—he's not somebody that is an impressionable, young little 16-year old.  When you watch him talk to the police, he thinks he's smarter than the police, and when they are interviewing him, he's trying to game them, and he's insisting that they don't know what they are talking about.  He's trying to be in control.  Then finally, eventually he admits that he was involved.  Then, of course, he turned around and denied that.

"So somebody with that kind of psychology is not somebody I feel confident is going to rehabilitate, change, and become a different person regardless of his brain development.  I think his brain is developed into who he is and who he was demonstrated on that whole event where he raped those two girls."

B

Rodriguez and Contreras both contend their sentences violate the constitutional prohibition against cruel and unusual punishment. Based on the current state of the law applicable to juvenile nonhomicide offenders, we are compelled to agree.

"The Eighth Amendment provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.' This constitutional provision 'guarantees individuals the right not to be subjected to excessive sanctions.' [Citation.] This right 'flows from the basic " 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " ' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1374 (*Gutierrez*).)

The United States Supreme Court has applied this constitutional provision to categorically ban sentences of life without the possibility of parole for juveniles who commit nonhomicide offenses. (*Graham*, *supra*, 560 U.S. 48 at pp. 74-75.) The Court explained that, while a juvenile who commits a nonhomicide offense need not be guaranteed eventual freedom, the juvenile must have "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." (*Id*. at p. 75.)

The principal rationale for the ban is " 'that children are constitutionally different from adults for purposes of sentencing' in three important ways. [Citation.] 'First, children have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment"

38

and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]." [Citation.]' [Citation.] For these reasons, 'juveniles have diminished culpability and greater prospects for reform,' and are thus ' "less deserving of the most severe punishments." ' " (*Gutierrez*, *supra*, 58 Cal.4th at p. 1375, citing *Miller v. Alabama* (2012) 567 U.S. ____, ____, [132 S.Ct. 2455, 2464] (*Miller*).)

In addition, the Court has concluded the penological goals of retribution, deterrence, incapacitation, and rehabilitation do not provide adequate justification for sentences of life without parole for juvenile nonhomicide offenders. (*Graham*, *supra*, 560 U.S. at p. 71.) " 'Because " '[t]he heart of the retribution rationale' " relates to an offender's blameworthiness, " 'the case for retribution is not as strong with a minor as with an adult.' " [Citations.] Nor can deterrence do the work in this context, because " 'the same characteristics that render juveniles less culpable than adults' "—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. [Citation.] Similarly, incapacitation could not support the life-without-parole sentence in *Graham*: Deciding that a "juvenile offender forever will be a danger to society" would require "mak[ing] a judgment that [he] is incorrigible"—but " 'incorrigibility is inconsistent with youth.' " [Citation.] And for the same reason, rehabilitation could not justify that sentence. Life without parole "forswears altogether the rehabilitative ideal." [Citation.] It reflects "an irrevocable judgment about [an offender's] value and place in society," at odds with a child's capacity for change.' "

(*Gutierrez*, *supra*, 58 Cal.4th at p. 1376, citing *Miller*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2465]; *Graham*, *supra*, 560 U.S. at p. 79.)

The California Supreme Court has interpreted the categorical ban established in *Graham* to also apply to aggregate sentences which are the functional equivalent of life without the possibility of parole because the defendant's first parole eligibility date falls outside the defendant's natural life expectancy.[6] (*Gutierrez*, *supra*, 58 Cal.4th at p. 1378; *Caballero*, *supra*, 55 Cal.4th at p. 268.) Although Rodriguez's and Contreras's first parole eligibility date theoretically falls within their expected lifetimes, they contend their sentences nonetheless violate the ban because their sentences deny them a meaningful opportunity for release on parole.

The United States Supreme Court has not provided any guidance on what constitutes a meaningful opportunity for parole and, instead, has left the matter for the states to address in the first instance. (*Graham*, *supra*, 560 U.S. at p. 75.) The California Supreme Court also has not provided any guidance; however, it is currently reviewing the matter. (*In re Alatriste* (2013) 220 Cal.App.4th 1232, review granted Feb. 19, 2014, S214652, consolidated with *In re Bonilla*, review granted Feb. 19, 2014, S214960.)

Pending further guidance, we must consider the constitutional propriety of Rodriguez's and Contreras's sentences in light of the two interrelated requirements

---

6    In this context, "the term 'life expectancy' means the normal life expectancy of a healthy person of defendant's age and gender living in the United States." (*People v. Caballero* (2012) 55 Cal.4th 262, 267, fn. 3 (*Caballero*).) In their sentencing statement below, the People provided a life expectancy table showing the average life expectancy of a Hispanic male is approximately 78 years.

underpinning *Graham*'s holding: (1) a state must give a juvenile nonhomicide offender a realistic chance to demonstrate maturity and reform, and (2) a state may not decide at the time of sentencing a juvenile nonhomicide offender is "irredeemable" and "never will be fit to reenter society." (*Graham*, *supra*, 560 U.S. at pp 75, 79, 82.) Rodriguez's and Contreras's sentences do not meet either requirement. Even under an optimistic projection of their life expectancies, the sentences preclude any possibility of parole until they are near the end of their lifetimes as the parties agree Rodriguez will be 66 and Contreras will be 74 when they are first eligible for parole. This falls short of giving them the realistic chance for release contemplated by *Graham*. Instead, the sentences tend to reflect a judgment Rodriguez and Contreras are irretrievably incorrigible. While this judgment may ultimately prove to be correct, it is not one *Graham* permits to be made at the outset. Accordingly, we conclude the sentences violate the Eighth Amendment under the standards articulated in *Graham*.[7]

Our conclusion is not intended to diminish the severity of Rodriguez and Contreras's crimes or the lasting impact the crimes will have on the victims. Whatever their final sentences, Rodriguez and Contreras will need to do more than simply bide their time in prison to demonstrate parole suitability. The Board of Parole Hearings (the Board) considers a wide range of information in determining whether a prisoner is suitable for parole. (Cal. Code Regs., tit. 15, § 2281.) The record before us indicates Rodriguez and Contreras have much work ahead of them if they hope to one day

---

[7]     Given our conclusion, we need not address Rodriguez's alternate contention his sentence is grossly disproportionate to his culpability.

persuade the Board they no longer present a current danger to society and should be released on parole.

Our conclusion is also not intended to discount the lower court's understandable desire to avoid a sentence that would appear to give Rodriguez and Contreras "a free victim." We note any indeterminate sentence the court may choose to impose on remand will account for the existence of multiple victims as the existence of multiple victims is a factor in determining parole suitability. (Cal. Code Regs., tit. 15, §2281, subd. (c)(1)(A).)

## DISPOSITION

The sentences are reversed and the matter is remanded for resentencing. The sentencing court is directed to consider all mitigating circumstances attendant in the appellants' crimes and lives and impose a time when they may seek parole from the parole board consistent with the holding in *Graham*, *supra*, 560 U.S. at p. 82. (*Caballero*, *supra*, 55 Cal.4th at pp. 268-269.) The judgments are affirmed in all other respects.

MCCONNELL, P. J.

I CONCUR:

McDONALD, J.

O'ROURKE, J.

I concur in the result as to part IX. In all other respects, I concur with the balance of the opinion.

O'ROURKE, J.

42